UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PAUL HEFFERNAN and JEROME P.    :
BROWN, as Trustees of the NEW    :
ENGLAND HEALTH CARE EMPLOYEES    :
WELFARE FUND and the NEW    :
ENGLAND HEALTH CARE EMPLOYEES    :
PENSION FUND; and ALMENA    :
THOMPSON, as trustee of the    :
NEW ENGLAND HEALTH CARE    :
EMPLOYEES UNION, DISTRICT    :
1199, and THE CONNECTICUT    :
NURSING HOMES UPGRADING FUND;    :
                                 :
        Plaintiffs,              :
                                 :
v.                               :    No. 3:02CV1025 (DJS)
                                 :
ICARE MANAGEMENT, LLC; CHELSEA   :
PLACE CARE CENTER, LLC;          :
TRINITY HILL CARE CENTER, LLC;   :
and WINTONBURY CARE CENTER,      :
LLC;                             :
                                 :
        Defendants.              :

<u>**MEMORANDUM OF DECISION**</u>

Plaintiffs, Paul Heffernan and Jerome Brown, as trustees of the New England Health Care Employees Welfare Fund ("Welfare Fund") and the New England Health Care Employees Pension Fund ("Pension Fund"); and Almeda Thompson, as trustee of the New England Health Care Employees Union, District 1199, and the Connecticut Nursing Homes Upgrading Fund ("Training Fund") (hereinafter collectively "the Funds") bring this action pursuant to Section 515 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, to recover delinquent contributions,

interest, penalties, and liquidated damages from defendant
employers-fund contributors iCare Management, LLC ("iCare");
Chelsea Place Care Center, LLC ("Chelsea Place"); Trinity Hill
Care Center, LLC ("Trinity Hill"); and Wintonbury Care Center,
LLC ("Wintonbury") (hereinafter collectively "the Employers").
The Employers have asserted counterclaims against the Funds to
recover overpayments and to obtain an accounting of the Funds.
The Funds filed a motion to dismiss (dkt. # 25) the Employers'
counterclaims and a motion for summary judgment (dkt. # 29) on
their claims.  For the reasons set forth herein, the Funds'
motion to dismiss (dkt. # 25) is **GRANTED,** and the Funds' motion
for summary judgment (dkt. # 29) is **GRANTED in part** and **DENIED in
part.**

## I. FACTS

The Funds are Taft-Harley multiemployer trust funds
established pursuant to written Declarations and Agreements of
Trust in accordance with the provisions of Section 302(c)(5) of
the Labor Management Relations Act ("LMRA"), 29 U.S.C. §
185(c)(5).  Each Fund is jointly trusteed by an equal number of
labor and management representatives.   Paul Heffernan is a
management trustee of the Welfare Fund and Pension Fund, and
Jerome Brown is a union trustee of the Welfare Fund and Pension
Fund.   Almeda Thompson is the union trustee for the Training
Fund.  The Welfare Fund is an "employee welfare benefit plan" as

that term is defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1), the Pension Fund is an "employee pension benefit plan" as that term is defined in Section 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A), and the Training Fund is an "employee welfare benefit plan" as that term is defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1). Heffernan, Brown, and Thompson are "fiduciar[ies]" of their respective Funds as that term is defined in Section 3(21)(a) of ERISA, 29 U.S.C. § 1002(21)(a).

Defendants Chelsea Place, Trinity Hill, and Wintonbury operate long-term care skilled nursing facilities in the greater Hartford, Connecticut area. Defendant iCare is the management agent for Chelsea Place, Trinity Hill, and Wintonbury. Chris Wright is the "manager," as that term is defined in Section 34-140 of the Connecticut General Statutes, of all four defendant limited liability companies. The Funds claim, and the Employers deny, that the Employers are either "employer[s]" as that term is defined in Section 3(5) of ERISA, 29 U.S.C. § 1002(3)(5), or "part[ies] in interest" as that term is defined in Section 3(14) of ERISA, 29 U.S.C. § 1002(3)(14).

The Funds allege that the Employers failed to contribute the proper amount of money to the Funds during the period of April of 1999 through August of 2001. During this time period, the Employers were obligated to contribute money to the Funds under the terms of two collective bargaining agreements: (1) the first

executed by the "Employer," which is defined as "Solomon Services, LLC, for its facilities at Chelsea Place Care Center, Hartford, Connecticut; Trinity Hill Care Center, Hartford, Connecticut; and Wintonbury Health Care Center, Bloomfield, Connecticut," (dkt. # 34, Ex. 4, Preamble, at 1), and the New England Health Care Employees Union, District 1199, AFL-CIO, which was effective between June 8, 1999 through March 15, 2001 ("1999 CBA"); and (2) the second executed by "iCare Management, LLC, on behalf of facilities it manages: Chelsea Place Care Center, LLC, Hartford, Connecticut, Trinity Hill Care Center, LLC, Hartford, Connecticut, and Wintonbury Health Care Center, LLC, Bloomfield, Connecticut," (dkt. # 34, Ex. 3, Preamble, at 2), and the New England Health Care Employees Union, District 1199, AFL-CIO, which is effective between March 16, 2001 through March 15, 2005 ("2001 CBA").

With respect to the Welfare Fund, the relevant provisions of the CBAs are the following.  First, the 1999 CBA states that

> A. The Employer shall contribute to the New England Health and Welfare Fund.  The Employer may choose Payment Option 1 or Payment Option 2, below.  However, the Employer must notify the Union of which option it has chosen by September 9, 1999.

> 1. Option 1.  Twenty-one percent (21%) of the gross bargaining unit payroll of participating bargaining unit employees, exclusive of employees who have not completed ninety (90) days of employment with a cap of six thousand dollars ($6,000) average annual payment per person.

> 2. Option 2.  On April 1, 1999, nineteen percent (19%)

-4-

and on July 1, 2000, twenty percent (20%) of gross bargaining unit payroll of participating bargaining unit employees, exclusive of employees who have not completed ninety (90) days of employment, with no cap.

B. For either option, the Employer shall not make contributions for **Wintonbury** workers hired after December 29, 1995 who work fewer than twenty (20) hours a week.  The number of employees working less than twenty (20) hours a week shall not exceed the number as of December 29, 1995.

(Dkt. # 34, Ex. 4, Art. 20, at 37-38).  Second, the 2001 CBA

states that

A. The Employer[1] shall contribute to the New England Health and Welfare Fund as follows.

1. Effective upon execution of this agreement: Twenty-one percent (21%) of the gross bargaining unit payroll of participating bargaining unit employees, exclusive of employees who have not completed ninety (90) days of employment with a cap of six thousand dollars ($6,000) average annual payment per person.

2. Effective January 1, 2002: Twenty-two percent (22%) of the gross bargaining unit payroll of participating bargaining unit employees, exclusive of employees who have not completed ninety (90) days of employment with a cap of six thousand five hundred dollars ($6,500) average annual payment per person.

3. The cap on contributions shall be increased by two hundred and fifty dollars ($250) on January 1 of 2003, 2004, and 2005.

B. **Wintonbury** : The Employer shall not make contributions for workers hired after December 29, 1995 who work fewer than twenty (20) hours a week.  The number of employees working less than twenty (20) hours a week shall not exceed the number as of December 29, 1995.

(Dkt. # 34, Ex. 3, Art. 20, at 30).

---

[1] The term "Employer" is not defined in the 2001 CBA.

The following provisions of the relevant CBAs pertain to the Pension Fund.  First, the 1999 CBA provides that

> A. The Employer shall contribute to the New England Health Care Employees Pension Fund, and shall make monthly contributions based upon the previous month's payroll.  Payments shall be due no later than thirty (30) days following the payroll month on which they are based.  By way of example, an August contribution shall be based on the payroll for the month of July and shall be made no later than the thirtieth (30th) day of August.
>
> B. The contribution shall consist of a sum equal to eight percent (8%) of gross payroll of the employees for the preceding month exclusive of amounts earned by the employees for the first ninety (90) calendar days following the beginning of their employment [**Wintonbury Health Care Center**: and of amounts earned by part-time employees who do not regularly work twenty (20) hours of more per week].

(Dkt. # 34, Ex. 4, Art. 28, at 45-46) (bracketed text in original).  Second, the 2001 CBA provides that

> A. The Employer shall contribute to the New England Health Care Employees Pension Fund, and shall make monthly contributions based upon the previous month's payroll.  Payments shall be due no later than thirty (30) days following the payroll month on which they are based.  By way of example, an August contribution shall be based on the payroll for the month of July and shall be made no later than the thirtieth (30th) day of August.
>
> B. Effective June 1, 2001, the contribution shall consist of a sum equal to six percent (6%) of gross payroll of the employees for the preceding month exclusive of amounts earned by the employees for the first ninety (90) calendar days following the beginning of their employment [**Wintonbury Care Center**: and of amounts earned by part-time employees who do not regularly work twenty (20) hours or more per week].  On June 1, 2003, the contribution shall consist of a sum equal to eight percent (8%) of gross payroll as above described.  However, the contribution will be increased

-6-

to eight and one-half percent (8.5%) if determined by
the fund's actuaries that such contribution is
necessary to fund the current level of benefits.  In
any event, the contribution for the final month of the
contract shall be eight percent (8%).

(Dkt. # 34, Ex. 3, Art. 28, at 37) (bracketed text in original).

Finally, the following are the provisions of the relevant

CBAs that pertain to the Training Fund.  First, the 1999 CBA

states that

A. The Employer shall contribute to the New England
Health Care Employees Training Fund (the "Training
Fund") and shall make monthly payments based upon the
previous month's payroll.

B. The contribution shall consist of a sum equal to one
percent (1%) of the monthly gross payroll of employees
in the bargaining unit [**Chelsea Place** and **Trinity Hill**:
exclusive of amounts earned by employees who have not
completed their probationary period].

C. Payments shall be due no later than thirty (30) days
following the payroll month on which they are based.

(Dkt. # 34, Ex. 4, Art. 32, at 48) (punctuation indicating

alteration in original).  Second, the 2001 CBA provides that

A. The Employer shall contribute to the New England
Health Care Employees Training Fund (the "Training
Fund") and shall make monthly payments based upon the
previous month's payroll.

B. The contribution shall consist of a sum equal to on
percent (1%) of the monthly gross payroll of employees
in the bargaining unit [**Chelsea Place** and **Trinity Hill**:
exclusive of amounts earned by employees who have not
completed their probationary period].  No contributions
shall be made for Trinity Hill until September 1, 2003.

C. Payments shall be due no later than thirty (30) days
following the payroll month on which they are based.

(Dkt. # 34, Ex. 3, Art. 31, at 38-39) punctuation indicating

-7-

alteration in original).

On January 28, 2002, as revised on May 2, 2002, the accounting firm of Buckley, Frame, Boudreau & Company, P.C., audited the Employers' contributions to the Funds and concluded that the Employers were delinquent in their contributions.  The delinquencies cited in the accounting report correspond to two differences of opinion regarding the Employers' obligations under the language of the 1999 CBA and the 2001 CBA.  First, the audit revealed that the wages of workers at Chelsea Place and Trinity Hill who worked twenty hours or less per week were not included in the gross wages figure from which the contributions to the Welfare Fund and the Pension Fund were derived.  Also, the audit revealed that the wages of workers at Chelsea Place, Trinity Hill, and Wintonbury who worked twenty hours or less per week were not included in the gross wages figure from which the contributions to the Training Fund were derived.  The parties disagree as to whether the auditor properly interpreted the pertinent provisions of the relevant CBAs.

Second, the auditors reported a deficiency in the Employers' contributions corresponding to the cap on contributions to the Welfare Fund.  Both the 1999 CBA and the 2001 CBA impose a "cap of six thousand dollars ($6,000) average annual payment per person" upon the Employers' contributions, which, pursuant to the terms of the 2001 CBA, rises to $7,250 as of January 1, 2005.

-8-

The auditors, and the Funds, interpret the cap provision to require the Employers to cease contributions altogether when the average yearly contribution per employee reaches $6,000. The Employers interpret the cap provision to limit contributions to $6,000 per each employee per year, and, once this limit has been reached with respect to a particular employee at any point during the year, the Employers omit that employee's wages from the gross payroll figure from which the Employers' remaining monthly contributions are derived.

By way of illustration, assume that there are two employees. Assume that Smith's gross monthly pay is $10,000 per month, while Jones's gross monthly pay is $5,000 per month. The Employers' contribution to the fund is 21% of the gross monthly pay to these two employees. The auditors and the Funds argue that the cap takes effect once the employer contributes $12,000 in a given year, which is when the average contribution per employee reaches $6,000. The average contribution for Smith and Jones would exceed $12,000 in the fourth month of the year (($3,250 * 4)/2 = $13,000) so, according to the auditors and Funds, Employer contributions would cease at that time. The Employers, however, argue that they must consider exactly how much money they contributed with respect to each individual employee. Therefore, under the Employers' interpretation, contributions based upon Smith's salary would cease in the third month, when

contributions exceeded $6,000 ($2,100 * 3 = $6,300), whereas
contributions based upon Jones's salary would not cease until the
sixth month ($1,050 * 6 = $6,300).  Under the Employers' method,
contributions based upon Jones's individual salary remain under
the cap longer when only Jones's individual salary is considered
than they would if the contributions derived from Jones's and
Smith's salaries are considered together, as the auditors and
Funds advocate.  The alleged delinquency is therefore created
because the auditor and Funds' method would maximize Employer
contributions in a given year.

The parties then attempted to resolve their differences,
and, when these attempts failed, the Funds commenced this action
on June 14, 2002.

## II. DISCUSSION

Plaintiffs, as trustees of multiemployer benefit funds, seek
to recover delinquent contributions, interest, penalties, and
liquidated damages from defendant employers pursuant to Section
515 of ERISA.  Section 515 of ERISA provides the following:

> Every employer who is obligated to make contributions
> to a multiemployer plan under the terms of the plan or
> under the terms of a collectively bargained agreement
> shall, to the extent not inconsistent with law, make
> such contributions in accordance with the terms and
> conditions of such plan or such agreement.

29 U.S.C. § 1145.  "The liability created by § 515 may be
enforced by the trustees of a plan by bringing an action in
federal district court pursuant to § 502."  Laborers Health and

<u>Welfare Trust Fund For Northern California v. Advanced</u>

<u>Lightweight Concrete Co., Inc.</u>, 484 U.S. 539, 547 (1988); <u>see</u> 29

U.S.C. § 1132(a)(3) ("A civil action may be brought‐ . . .  by a

participant, beneficiary, or fiduciary (A) to enjoin any act or

practice which violates any provision of this subchapter or the

terms of the plan, or (B) to obtain other appropriate equitable

relief (i) to redress such violations or (ii) to enforce any

provisions of this subchapter or the terms of the plan. . . .").

"Although not a party to the controlling documents, a

multiemployer plan can enforce, as written, the contribution

requirements of the documents and is not subject to the

understandings or defenses available to the original parties."

<u>Bakery and Confectionery Union and Industry Intern. Pension Fund</u>

<u>v. New World Pasta Co.</u>, 309 F. Supp. 2d 716, 724 (D. Md. 2004).

The Employers deny that a delinquency exists and contend

that they did in fact contribute to the Funds in accord with the

terms of the relevant CBAs.  The Employers have also asserted the

defense of estoppel, and they argue that the court should

preclude the Funds from claiming that a delinquency exists.

Further, the Employers claim that they are entitled to recover

overpayments to the Funds and to obtain an accounting of the

Funds.  The Funds have requested summary judgment on their claims

under Rule 56 of the Federal Rules of Civil Procedure and have

also requested dismissal of the Employers' counterclaims under

Rule 12(b) of the Federal Rules of Civil Procedure.  Each motion
is discussed herein in turn.

A. MOTION FOR SUMMARY JUDGMENT

1.  STANDARD

A motion for summary judgment may be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  Summary judgment is appropriate if, after
discovery, the nonmoving party "has failed to make a sufficient
showing on an essential element of [its] case with respect to
which [it] has the burden of proof."  Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).  "The burden is on the moving party 'to
demonstrate the absence of any material factual issue genuinely
in dispute.'"  American Int'l Group, Inc. v. London Am. Int'l
Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v.
Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.
1975)).  A dispute concerning a material fact is genuine "'if
evidence is such that a reasonable jury could return a verdict
for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist.,
963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view all
inferences and ambiguities in a light most favorable to the

-12-

nonmoving party.  See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

## 2. PARTIES

The Employers raise two issues regarding the parties to this action.  First, the Employers contest the ability of the named plaintiff trustees to bring this action.  The Employers argue that, because "there is no evidence that the trustees of any of the individual Funds have collectively authorized the named plaintiffs to bring this lawsuit, or that the trustees have collectively made a determination of delinquency," the Funds are not entitled to summary judgment.  (Dkt. # 54 at 24) (emphasis omitted).

Plaintiffs may maintain this action.  Plaintiffs are trustees of the Funds and are "fiduciar[ies]" as that term is defined in 29 U.S.C. § 1002(21)(A).  As "fiduciar[ies]," plaintiffs may bring a civil action to enforce the rights conferred by 29 U.S.C. § 1145 as authorized by 29 U.S.C. § 1132(a)(3).  The Employers cite no authority for the proposition that each trustee of the plan must join this action as a plaintiff, nor have they brought forth any evidence that the named plaintiffs do not have the authority to bring this action.  Plaintiffs have standing to sue under 29 U.S.C. § 1132(a)(3), and there is absolutely no indication that they lack the authority to

bring this action.  Accordingly, plaintiffs may proceed with this action.

Second, the Employers claim that they cannot be held liable for delinquent contributions.  The Employers argue that the only entity that may be held liable for delinquent contributions is Solomon Health Services, LLC ("SHS"), which is not a party to this action, because SHS is defined as the "Employer" in the 1999 CBA and the 2001 CBA does not define the term "Employer." Because, as the Employers contend, only an "Employer" is obligated to contribute to the Funds under the 1999 CBA and the 2001 CBA, only SHS may be held liable for delinquent contributions because it is the only entity expressly defined as an "Employer" under either CBA.

The Employers' argument lacks merit.  Each defendant is an "employer" as that term is defined in 29 U.S.C. § 1002(5). Further, each defendant is an "employer who is obligated to make contributions to a multiemployer plan," 29 U.S.C. § 1145, with respect to both the 1999 CBA and the 2001 CBA by virtue of its managing agent signing these agreements "for" each defendant in the 1999 CBA and "on behalf of" each defendant in the 2001 CBA. Although the term "Employer" is not expressly defined in the 2001 CBA, only one meaning is possible when the entire CBA is viewed as a whole: "iCare Management, LLC, on behalf of facilities it manages: Chelsea Place Care Center, LLC, Hartford, Connecticut,

Trinity Hill Care Center, LLC, Hartford, Connecticut, and Wintonbury Health Care Center, LLC, Bloomfield, Connecticut." The practical consequence of the Employers' argument with respect to the 2001 CBA is that nobody is obligated to contribute to the Funds because "Employer" is not defined, which could not have been the intention of the parties.  As such, the plain language of the CBA obligates SHS,[2] Chelsea Place, Trinity Hill, and Wintonbury to contribute to the Funds, and the 2001 CBA obligates iCare, Chelsea Place, Trinity Hill, and Wintonbury to contribute to the Funds.  The Employers may therefore be held liable under 29 U.S.C. § 1145 and 29 U.S.C. § 1132(g)(2).

### 3. CBA LANGUAGE

The Funds claim that the Employers have been delinquent in their contributions to the Funds.  The Employers argue that they have contributed to the Funds according to the terms set forth in the governing CBAs.  In recognition of the fact that "benefit plans must be able to rely on the contribution promises of employers because plans must pay out to beneficiaries whether or not employers live up to their obligations," Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990), the Court of Appeals for the Second Circuit has recognized only two

---

[2] SHS is not named as a defendant.  The Funds apparently seek to hold iCare liable for SHS's obligations under the theory of successor liability.  To the extent they seek to do so, the Funds have not met their burden of proving that, as a matter of law, iCare is liable for SHS's obligations as its successor.

defenses to Section 515 collection actions: "(1) that the pension contributions themselves are illegal . . . , and (2) that the collective bargaining agreement is void (not merely voidable)," id. Although the defenses to Section 515 collection actions are limited, the employer may argue that its contributions were in accord with the operative contractual language, and therefore no delinquency existed.  See DeVito v. Hempstead China Shop, Inc., 38 F.3d 651, 653-54 (2d Cir. 1994).

Here, the parties dispute the meaning of certain provisions of the 1999 and 2001 CBAs.  In cases where the employer denies liability by claiming that it contributed funds pursuant to the terms of the governing agreement, the Court of Appeals has stated the following:

> When courts interpret CBAs, traditional rules of contract interpretation apply as long as they are consistent with federal labor policies. . . .  When provisions in the agreement are unambiguous, they must be given effect as written. . . .  Only when provisions are ambiguous may courts look to extrinsic factors--such as bargaining history, past practices, and other provisions in the CBA--to interpret the language in question. . . .  In addition, as with all contracts, courts should attempt to read CBAs in such a way that no language is rendered superfluous.

Aeronautical Indus. Dist. Lodge 91 of Intern. Ass'n of Machinists and Aerospace Workers, AFL-CIO v. United Technologies Corp., Pratt & Whitney, 230 F.3d 569, 576 (2d Cir. 2000).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous. . . .

-16-

The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157-58 (2d Cir. 2000) ("Compagnie Financiere").   "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" Id. at 158 (quoting Sayers v. Rochester Tel. Corp. Supplemental Management Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993)); see Sayers, 7 F.3d at 1094 ("If the language is susceptible to different reasonable interpretations, and 'where there is relevant extrinsic evidence of the parties' actual intent,' then the contract's meaning becomes an issue of fact precluding summary judgment.") (quoting  Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)).   "No ambiguity exists when contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Sayers, 7 F.3d at 1095 (quoting Breed v. Ins. Co. of North America, 46 N.Y.2d 351, 355 (1978)).

     The dispute regarding the CBA language focuses upon the clauses defining the amount the Employers must contribute to the Funds.  The CBAs require the Employers to contribute a certain

percentage of wages paid to the union employees with respect to each Fund.  The CBAs, however, express this obligation in different terms with respect to each Fund, and therefore a discussion of the disputed phrases pertaining to each Fund is warranted.

### i. Welfare Fund

First, in both the 1999 and 2001 versions of the CBA, contributions to the Welfare Fund are based upon a percentage of the "gross bargaining unit payroll of participating bargaining unit employees. . . ."  Wages paid to employees working at Wintonbury less than twenty hours per week are expressly excluded from the sum from which the contribution amount is derived in both versions of the CBA.  The Funds argue that wages paid to employees who work less than twenty hours per week should be included in the gross payroll amount because "participating bargaining unit employees" include employees who work less than twenty hours per week, with the express exception of those working at Wintonbury.  The Employers argue that, because employees who work less than twenty hours per week are not eligible to receive benefits pursuant to the Welfare Plan, these employees are not "participating bargaining unit employees."

Because both parties have offered reasonable interpretations of the operative CBA language, the provisions governing the employer's contributions to the Welfare Plan are ambiguous.  The

-18-

Funds' interpretation is supported by the express exemption for wages paid to Wintonbury employees who work less than twenty hours per week because, if all wages paid to employees who work less than twenty hours per week were excluded, then the clause excluding wages paid to Wintonbury employees would be surplusage. The Employers' interpretation, however, also finds support in the language of the CBAs because the CBAs require contributions for "participating bargaining unit employees," which is a term that is not defined by either CBA. The Employers' assertion that this term refers to employees who are eligible to receive benefits is plausible, and is supported by evidence of past pratices. The court must therefore allow the parties to present evidence of their intentions regarding the Employers' obligation to contribute. Summary judgment on plaintiffs' Section 515 claim as it relates to the Welfare Fund is denied.

### ii. Pension Fund

Second, in both the 1999 and 2001 versions of the CBA, contributions to the Pension Fund are based upon a percentage of the "gross payroll of the employees of the preceding month. . . ." Wages paid to employees working at Wintonbury less than twenty hours per week are excluded from the sum from which the contribution amount is derived in both versions of the CBA. The Funds argue that wages paid to employees who work less than twenty hours per week should be included in the "gross payroll of

the employees of the preceding month," with the express exception of those working at Wintonbury.  The Employers argue that, because employees who work less than twenty hours per week are not eligible to receive benefits pursuant to the Pension Plan, wages paid to these employees should be excluded from the "gross payroll of the employees of the preceding month."

The provisions setting forth the employer's contribution obligations to the Pension Fund are not ambiguous because the Employers' proposed interpretation is not supported by the text of the CBA.  Unlike the language used in the provisions governing contributions to the Welfare Fund, the language at issue here could not be construed to condition the inclusion of employee's wages upon that employee's eligibility to participate in the Welfare Plan.  Further, if the terms of the CBAs excluded wages paid to employees who worked less than twenty hours per week from the equation, the express prohibition for the wages of Wintonbury employees who work less than twenty hours per week would be meaningless.  Given the complete lack of textual support for the Employers' argument, and the court's obligation to make a reasonable effort to avoid rendering language meaningless or surplusage, only one interpretation of the CBA language is possible with respect to the Pension Fund.  Therefore, the Funds' motion for summary judgment is granted with respect to the Pension Fund.

iii. Training Fund

Third, in both the 1999 and 2001 versions of the CBA, contributions to the Pension Fund are based upon a percentage of "gross payroll of the employees in the bargaining unit. . . ." Under the terms of both CBAs, both part time and full time employees are members of the bargaining unit. (See Dkt. # 34, Ex. 4, Art. I § A, at 2-3; Dkt. # 34, Ex. 3, Art. I § A, at 3-4). The Funds argue that wages paid to employees who work less than twenty hours per week should be included in the "gross payroll of the employees in the bargaining unit." The Employers argue that, because employees who work less than twenty hours per week are not eligible to receive benefits pursuant to the Training Fund, wages paid to these employees should be excluded from the "gross payroll of the employees in the bargaining unit."

The provisions setting forth the employer's contribution obligations to the Training Fund are not ambiguous because the Employers' proposed interpretation is not supported by the text of the CBAs. Unlike the language used in the provisions governing contributions to the Welfare Fund, but like the language governing contributions to the Pension Fund, the language directing contributions to the Training Fund could not be construed to condition the inclusion of employee's wages upon that employee's eligibility to participate in the Training Fund. Also, the use of the term "employees in the bargaining unit" in

-21-

the phrase "gross payroll of the employees in the bargaining unit" expressly includes wages paid to part time employee because part time employees are members of the bargaining unit. Again, the Employers' proposed interpretation lacks support in the text of the CBAs. Therefore, plaintiffs' motion for summary judgment is granted with respect to the Training Fund.

      iv. Cap on Contributions to the Welfare Fund

According to the terms of both CBAs, employer contributions to the Welfare Fund are limited by "a cap of six thousand dollars ($6,000) average annual payment per person."[3] The Funds claim that the cap limits contributions when total contributions reach an average of $6,000 per person. Pursuant to this reading, the Funds would take the total contribution amount for one year and divide this sum by the number of persons; thus, every employee's wages would be included in the gross wages figure from which the contribution amount is derived until the cap is met. The Employers claim that the cap sets a limit on the annual contribution to the Welfare Fund of $6,000 per person. Pursuant to the Employers' interpretation, once the contributions reach $6,000 for any given individual, that individual's wages are excluded from the gross wages calculation from which the employer's contribution is derived.

-----

[3] The cap amount has increased from January 1, 2002 through 2005. For the purpose of simplicity, the court will discuss the original $6,000 cap only.

The Employers' interpretation has no support in the text of the CBAs because they ignore the word "average." The Employers' method of calculation is based upon actual contributions per employee. For example, if an employee's gross wages were $10,000 per month, and the employer was required to contribute 21% of the employee's gross wages ($2,100) to the Welfare Fund, the Employers would stop including this employee's gross wages in the aggregate calculation after the third month of the year, when the amount contributed would exceed $6,000. The Employers' method of administering the cap does not calculate an average, as required by the CBAs. In addition, the language of the CBAs cannot be read to allow for the exclusion of an individual's wages from the aggregate sum. Therefore, the Employers' interpretation must be rejected as a matter of law.

Although the Employers' interpretation is rejected as a matter of law, the court is unable to award judgment as a matter of law on this claim to the Funds because there are other ambiguities in the cap provision. Specifically, the term "person," which is essential to arriving at the "average," is not defined, and, within the context of the pertinent sentence, the meaning of the term is subject to different interpretations. For example, the term could be synonymous with "participating bargaining unit employee" or all employees, regardless of the employee's eligibility to participate in the Welfare Fund.

Because the term "person" is not defined, and given the other ambiguities relating to the Welfare Fund contributions, the Funds have not demonstrated that the CBA language at issue is subject to one reasonable interpretation.  Summary judgment is therefore denied with respect to this claim.

* * * *

The court notes that the Employers's arguments in opposition to the Funds' motion are in no small part based upon understandings, prior interpretations, and subjective opinions regarding the parties' intentions.  The court, however, cannot consider these arguments when it is faced with clear and unambiguous contract language.  As the Court of Appeals for the Second Circuit has recently explained,

> Multiemployer plans should be able to ascertain the controlling provisions of a CBA by reading it, without interviewing the negotiators or tracing provisions back to CBAs that have expired. Moreover, this rule--like the common-law parol evidence rule--gives the employer a salutary incentive to memorialize any unwritten understanding with the union concerning pension contributions, affords an easy way to enforce legislative protections of negotiated rights, and assures that multiemployer plans and their auditors will not become unwilling arbitrators in disputes arising from unwritten understandings between employers and unions.

New York State Teamsters Conference Pension & Retirement Fund v. United Parcel Service, Inc., 382 F.3d 272, 280-81 (2d Cir. 2004).  "The policies of Section 515 require that multiemployer plans be able to rely on the plain text of CBAs. Otherwise, . . .

multiemployer plans could become enmeshed in years of controversy concerning alleged unwritten agreements between employers and unions. Such troublesome disputes could easily be obviated by documenting such allegedly uncontroversial understandings in the express text of CBAs." Id. at 281. For the foregoing reasons, the court has not considered the Employers' arguments that are not founded in the contract language.

### 4. Estoppel

The Employers raise the defense of estoppel to plaintiff's Section 515 delinquency claims. In the context of this case, "estoppel is a judicial remedy by which a party may be precluded by his own act or omission from asserting a right to which it otherwise would have been entitled." 28 Am. Jur. 2d Estoppel and Waiver § 28 at 453 (2000). In other words, estoppel is a "means of preventing a party from asserting a legal claim or defense which is contrary or inconsistent with its prior action or conduct." Id. at 454. "Equitable estoppel is neither a claim nor a defense, but is a means of precluding the assertion of a claim or a defense against a party who has detrimentally relied on the conduct of the party asserting the claim or defense." Id. § 31 at 461.

Because the parties do not suggest what jurisdiction's law of estoppel applies, the court's analysis is founded upon general principles of estoppel, such as the following offered by Dan B.

-25-

Dobbs:

> [A]n estoppel case has three important elements.
> First, the actor, who usually must have knowledge,
> notice or suspicion of the true facts, communicates
> something to another in a misleading way, either by
> words, conduct, or silence.  Second, the other in fact
> relies, and relies reasonably or justifiably, upon that
> communication.  And third, the other would be harmed
> materially if the actor is later permitted to assert
> any claim inconsistent with his earlier conduct.

Dan B. Dobbs, Law of Remedies § 2.3(5) at 85 (2d ed. 1993)

(footnotes omitted).

The Employers cite two particular actions the trustees

performed that allegedly give rise to estoppel.  First, the

Employers claim that the trustees executed a release when the

trustees voluntarily dismissed a lawsuit against iCare's putative

predecessor in interest, SHS, and the other the Employers to this

action.  The Employers claim that this release absolved them from

all liability for contribution delinquencies prior to April 1,

1999 and disclosed any deficiencies known to the Funds from the

period of April 1, 1999 until the date the release was executed.

The Funds did not cite the deficiencies now claimed in this

lawsuit in the release or in a subsequent letter dated December

23, 1999 from the Funds' attorney confirming the known

deficiencies.

Second, the Employers argue that the Funds took the

affirmative step of allowing the Employers and union to execute

the 2001 CBA without raising the interpretation issues central to

-26-

the contribution delinquencies cited in the complaint.  The
Employers assert that the Funds deceived the Employers by
assuring them that the Funds did not know of any present
contribution deficiencies as late as December 23, 1999.  The
Employers also allege that the Funds allowed the Union and the
Employers to execute the 2001 CBA without disclosing the Funds'
novel interpretation of the CBA language that the Employers and
the Union were about to re-adopt.  The Employers allege that the
Funds did not raise the delinquency issues prior to the execution
of the 2001 CBA so that the Funds could sue the Employers for the
contribution deficiency without providing the Employers an
opportunity to negotiate new contribution terms more faithful to
the Employers' intentions.

     Plaintiff are not, as a matter of law, precluded by way of
equitable estoppel from bringing their claims to recover
delinquent contributions from the Employers because the Employers
cannot prove that the Funds had "have knowledge, notice or
suspicion of the true facts" when they stated that they knew of
no delinquencies as of December 23, 1999 and when the 2001 CBA
was executed.  The Employers simply rely on these historical
facts and have not offered any evidence that the Funds performed
these actions with an intent to deceive the Employers or induce
the Employers into acting.  The historical facts themselves do
not permit the inference that the Funds intended to deceive the

Employers or induce the Employers to act.  Therefore, the
Employers cannot prove their defense of estoppel.

### B. MOTION TO DISMISS

The Funds present two arguments in their motion to dismiss.
First, the Funds argue that the Employers' counterclaims must be
dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil
Procedure because, as employers, the Employers lack standing to
bring their counterclaims.  Second, the Funds argue that each
counterclaim must be dismissed pursuant to Rule 12(b)(6) of the
Federal Rules of Civil Procedure because ERISA and the federal
common law do not recognize a cause of action for an affirmative
refund of contributions or an accounting.

When considering a Rule 12(b)(6)[4] motion to dismiss, the
court accepts as true all factual allegations in the complaint
and draws inferences from these allegations in the light most
favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232,
236 (1974); Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).
Dismissal is warranted only if, under any set of facts that the

---

[4] The question of what standard to apply to a defense of lack
of standing can be quite vexing.  Compare Northwest Airlines,
Inc. v. County of Kent, Mich., 510 U.S. 355, 365 (1994)("The
question whether a federal statute creates a claim for relief is
not jurisdictional.") with Makarova v. U.S., 201 F.3d 110, 113
(2d Cir. 2000)("A case is properly dismissed for lack of subject
matter jurisdiction under Rule 12(b)(1) when the district court
lacks the statutory or constitutional power to adjudicate it.").
The court will not tackle this complex question in this case
because the parties do not provide any guidance and because the
Employers' counterclaims clearly lack merit.

plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. See Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir. 1998). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232). In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

The Funds' motion to dismiss is granted because the Employers' allegations are insufficient to sustain their counterclaims. The Employers' claim for recovery of overpayments or setoff fails because the Employers do not allege that the Funds' overpayment collection policies are arbitrary and capricious; indeed, the Employers admit that they have not yet availed themselves of these policies. See Brown v. Health Care and Retirement Corp. of Am., 25 F.3d 90, 94 (2d Cir. 1994)("[A] refund in excess of the fund's refund policy 'cannot be awarded unless supported by a determination that the refund policy is arbitrary or capricious.'")(quoting Dumac Forestry Serv., Inc. v.

-29-

Int'l. Bhd. of Electrical Workers, 814 F.2d 79, 82 (2d Cir. 1987)).  The Employers' counterclaim for an accounting also fails because the Employers have not asserted a statutory right to an accounting and have not set forth a substantial argument that the court should recognize an employer's federal common law right to an accounting of a multiemployer plan.  As such, the Funds' motion to dismiss the Employers' counterclaims is granted.

### III.  CONCLUSION

For the reasons set forth herein, plaintiffs' motion to dismiss (dkt. # 25) is **GRANTED,** and plaintiffs' motion for summary judgment (dkt. # 29) is **GRANTED in part** and **DENIED in part.**  A trial to the court shall follow regarding all remaining issues, and the parties shall comply with this court's joint trial memorandum order on or before **April 15, 2005.**

So ordered this 15th day of February, 2005.

**/s/DJS**
_____
     **DOMINIC J. SQUATRITO**
  **UNITED STATES DISTRICT JUDGE**